Entered on Docket
November 05, 2020
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

NOV 4 2020

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re:<br>TAMMY OGLETREE,<br>Debtor. | BAP No. NC-20-1087-FBG<br><br>Bk. No. 19-50392-SLJ |
| SARAH DAVIS,<br>Appellant,<br>v.<br>TAMMY OGLETREE,<br>Appellee. | **MEMORANDUM**[*] |

Appeal from the United States Bankruptcy Court
for the Northern District of California
Stephen L. Johnson, Bankruptcy Judge, Presiding

Before: FARIS, BRAND, and GAN, Bankruptcy Judges.

## INTRODUCTION

Creditor Sarah Davis appeals from the bankruptcy court's order overruling her objection to debtor Tammy Ogletree's chapter 13[1] plan. In particular, Ms. Davis objected on the ground that Ms. Ogletree's proposed treatment of two properties located in New York State violated the best

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

interest of creditors test under § 1325(a)(4). She argued that, if the properties were liquidated, there would be sufficient funds to pay all of Ms. Ogletree's unsecured creditors. The bankruptcy court overruled the objection, and Ms. Davis appealed.

We agree with the bankruptcy court that the chapter 13 plan did not violate the best interest of creditors test. We therefore AFFIRM.

## FACTUAL BACKGROUND[2]

### A.    Prepetition events

Ms. Ogletree, Ms. Davis, and Chadwick Greer were members of Eat Earth LLC, which operated a restaurant in Santa Cruz, California. In 2017, due to a business dispute, Ms. Ogletree and Mr. Greer allegedly ousted Ms. Davis from the business. Ms. Davis sued Ms. Ogletree and Mr. Greer in state court.

Ms. Ogletree, her mother (Carole Taub), and Mr. Greer owned as joint tenants a single-family residence at Ene Road in Plattekill, New York (the "Ene Road Property") that they purchased in 2004.

Ms. Ogletree and Mr. Greer were members of 46 Main St. LLC ("the LLC"). The LLC owned commercial real property located at 46 Main Street in New Paltz, New York (the "Main Street Property").

---

[2] We exercise our discretion to review the bankruptcy court's docket, as appropriate. *See Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 725 n.2 (9th Cir. BAP 2008).

### B. Ms. Ogletree's chapter 13 petition and proposed plans

On February 27, 2019, Ms. Ogletree filed a chapter 13 petition.[3] In her Schedule A/B, she valued the Ene Road Property at $289,068 and stated that she held a thirty-three percent interest worth $95,392.44.

She also scheduled her fifty percent interest in the LLC. She stated that the Main Street Property owned by the LLC was valued at $430,000 and encumbered by a two mortgages totaling $260,000. She valued her interest in the LLC at $85,000.

Ms. Ogletree did not schedule any secured creditors. She listed nonpriority unsecured creditors with claims totaling $111,696, including Ms. Davis' $40,000 disputed claim.

Her proposed chapter 13 plan provided that she would pay unsecured creditors in full. She proposed paying $100 per month for sixty months and liquidating the Main Street Property to realize $135,000.

Ms. Ogletree amended her proposed plan and schedules a number of times, each time decreasing the amount of distributions to nonpriority unsecured creditors. By her fifth amended plan, she proposed paying unsecured creditors just five percent of their allowed claims, or only $9,011.67. She no longer proposed selling the Main Street Property. She also valued the Ene Road Property at $0, claiming that she had no equitable

[3] Around the same time, Mr. Greer filed his own chapter 13 petition. The court confirmed his chapter 13 plan, and the case is pending.

interest in the property. She proposed surrendering the Ene Road Property to Heritage Bank of Commerce, which held a $187,000 claim.

Chapter 13 trustee Devin Dernham-Burke objected to various iterations of the amended plan. She argued that Ms. Ogletree's proposed payments were insufficient to pay all secured, priority, administrative, and general unsecured claims. She also argued that the plan violated the best interest of creditors test under § 1325(a)(4).

**C. Ms. Davis' objection to confirmation**

Ms. Davis objected to confirmation of the fifth amended plan (the "Objection"). She argued that Ms. Ogletree's proposed distributions to unsecured creditors were insufficient and that the plan failed to account for the equity in the Ene Road Property and the Main Street Property.

As for the Ene Road Property, Ms. Ogletree proposed to surrender the property to Heritage Bank, but Ms. Davis asserted that Ms. Ogletree actually planned to transfer her interest in the Ene Road Property to her mother. She asserted that there was no evidence that Ms. Taub was the sole owner of the Ene Road Property. Ms. Davis estimated that the sale of the Ene Road Property would result in $29,660 for unsecured creditors.

As for the Main Street Property, Ms. Davis argued that Ms. Ogletree owned a fifty percent interest in the LLC, which owned the Main Street Property. Ms. Davis estimated that the sale of the Main Street Property would yield $42,050 for unsecured creditors.

In response to the Objection, Ms. Ogletree filed a "Pre-Hearing Statement." She argued that Ms. Davis' calculations regarding the Main Street Property were wrong and unsupported by evidence.

Regarding the Ene Road Property, Ms. Ogletree attached a declaration in which she stated that her mother provided the entire $75,000 down payment and that neither she nor Mr. Greer contributed to the down payment and closing costs. She testified that, in 2016, her mother assumed sole responsibility of managing the property as a rental, allegedly paid off certain liens, and spent $15,000 renovating the Ene Road Property. She further testified that she had nothing to do with the property since 2014 and believed that her equitable interest in the property was worth $0.

The bankruptcy court held a hearing on the Objection. As for the Main Street Property, it held that, under both California and New York law, the bankruptcy estate did not include either the property or the rental income, because the property belonged to the LLC, not Ms. Ogletree personally. It noted that Ms. Ogletree's interest was determined by the LLC's operating agreement, which Ms. Davis did not provide.

The court also rejected Ms. Davis' arguments regarding the Ene Road Property. It held that the plan provided that Ms. Ogletree would surrender the property, which would terminate her interest in the property.

The court stated that Ms. Davis did not provide any evidence that Ms. Ogletree actually intended to transfer the Ene Road Property to her

mother; rather, the plan proposed that she would surrender the property to Heritage Bank. The court said that Ms. Davis did not establish that the Ene Road Property had any equity (or establish its value beyond a Zillow valuation) and that Ms. Ogletree stated that there would be a deficiency balance of $187,000 after surrendering the property.

The court stated that, under New York law, even though Ms. Ogletree owned a one-third interest in the Ene Road Property, the respective contributions of co-tenants are considered when determining the distribution of proceeds from a sale. It referenced Ms. Ogletree's declaration and found that Ms. Taube was entitled to at least $140,000 in reimbursements. It thus overruled the Objection.

The bankruptcy court entered an order overruling the Objection. Ms. Davis timely appealed.

Subsequently, the chapter 13 trustee withdrew her objection to confirmation, and the court confirmed the plan.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(L). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court erred in overruling the Objection.

## STANDARDS OF REVIEW

We review for abuse of discretion a bankruptcy court's decisions

regarding confirmation of a chapter 13 plan. *See de la Salle v. U.S. Bank, N.A. (In re de la Salle)*, 461 B.R. 593, 601 (9th Cir. BAP 2011). To determine whether the bankruptcy court has abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, we consider whether the bankruptcy court's application of the legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 & n.21 (9th Cir. 2009) (en banc).

"The liquidation value of a debtor's assets for purposes of the best interests of creditors test presents a question of fact. As such, we review the bankruptcy court's value findings under the clearly erroneous standard." *Messer v. Maney (In re Messer)*, No. BAP AZ-13-1215-PaKuD, 2014 WL 643712, at *2 (9th Cir. BAP Feb. 19, 2014) (citing *United States v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 653 (9th Cir. BAP 1994); *Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 493 (9th Cir. BAP 2003)). Factual findings are clearly erroneous if they are illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). If two views of the evidence are possible, the court's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

## DISCUSSION

**A. Under § 1325(a)(4), unsecured creditors must receive at least as much as they would in a hypothetical chapter 7 case.**

Ms. Davis argues that the bankruptcy court erred in overruling her Objection because Ms. Ogletree's general unsecured creditors would receive more in a hypothetical chapter 7 case.

To confirm a chapter 13 plan, the bankruptcy court must decide that the proposed plan satisfies certain criteria. One criterion is § 1325(a)(4), which is sometimes called the "liquidation analysis" or "best interest of creditors test." Section 1325(a)(4) provides that the court shall confirm a plan if:

> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]

§ 1325(a)(4). In other words, the value of the distributions to each creditor, under the plan, must be at least as much as the amount that each creditor would receive if the estate were liquidated and the proceeds distributed in a chapter 7 case. We have stated that:

> Analysis under § 1325(a)(4) requires a court to make two determinations: (1) the present value of the property to be distributed to unsecured creditors (the value of the stream of plan payments) as of the "effective date of the plan;" and (2) the amount available to unsecured creditors if a chapter 7

liquidation were held on the "effective date of the plan." *Bradley R. Kirk & Assocs., Inc. v. Spellman (In re Spellman)*, BAP No. CC-15-1026-KiKuF, 2016 WL 1165827, at *8 (9th Cir. BAP Mar. 22, 2016), *aff'd*, 737 F. App'x 807 (9th Cir. 2018).

In order for a chapter 13 plan to be confirmed, "each of the requirements of section 1325 **must be present** and the debtor has the burden of proving that each element has been met." *Barnes v. Barnes (In re Barnes)*, 32 F.3d 405, 407 (9th Cir. 1994); *see In re Goodrich*, Case No. 13-11223, 2014 WL 627429, at *1 (Bankr. N.D. Cal. Feb. 18, 2014) ("Pursuant to § 1325(a)(4) of the Bankruptcy Code, the debtor has the burden of showing that a creditor would not receive more in Chapter 7 than the debtor's plan provides.").

**B. The bankruptcy court did not err in its consideration of the Main Street Property.**

Ms. Davis argues that the bankruptcy court erred in declining to include the Main Street Property in its liquidation analysis. She argues that Ms. Ogletree's interest in that property is part of her bankruptcy estate and could be liquidated to pay unsecured creditors. We disagree.

Section 541(a)(1) provides that property of a bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." "Although the question whether an interest claimed by the debtor is 'property of the estate' is a federal

question to be decided by federal law, bankruptcy courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interests in property as of the commencement of the case." *Fursman v. Ulrich (In re First Prot., Inc.)*, 440 B.R. 821, 828 (9th Cir. BAP 2010) (quoting *McCarthy, Johnson & Miller v. N. Bay Plumbing, Inc. (In re Pettit)*, 217 F.3d 1072, 1078 (9th Cir. 2000)).

Ms. Davis concedes that the LLC, not Ms. Ogletree, owns the Main Street Property. She also does not challenge the bankruptcy court's holding that, under both California and New York law, the members' rights are determined by the LLC's operating agreement. But Ms. Davis failed to provide a copy of that agreement. Without the operating agreement, she could not prove her contention about the value of Ms. Ogletree's interest in the LLC. Ms. Davis' failure to offer this crucial piece of evidence justified the rejection of her argument.

Ms. Davis attempts to circumvent her failure of proof by arguing that, because both Ms. Ogletree and Mr. Greer are pursuing their respective chapter 13 bankruptcy cases, "a Chapter 7 Trustee could cause the LLC to sell the real property and distribute the net proceeds to [the] bankruptcy estate." But this does not solve her evidentiary problem. It is true that, as a general rule, "all of [a debtor's] contractual rights and interest in [an LLC] [becomes] property of their estate under § 541(a)(1) by operation of law when they filed their petition." *Id.* at 830. "[W]here a debtor has a

membership interest in a single-member LLC . . . , the Chapter 7 trustee succeeds to all of the debtor's rights, including the right to control that entity, and a trustee need not take any further action to comply with state law before exercising such control." *Schwartzer v. Cleveland (In re Cleveland)*, 519 B.R. 304, 306 (D. Nev. 2014). But the rights to which the trustee succeeds are defined and limited by the LLC's operating agreement. A chapter 7 trustee would step into Ms. Ogletree's shoes and assume only the rights she had under the operating agreement. Because Ms. Davis failed to present the court with the LLC's operating agreement, there was no factual basis for her argument that a chapter 7 trustee in her case (or in Mr. Greer's case, or both of them acting in concert) could have liquidated the Main Street Property and split the net proceeds equally.

Ms. Davis cites only a single out-of-circuit case, *In re Albright*, 291 B.R. 538 (D. Colo. 2003), in support of her position that a chapter 7 trustee could assume control of both Ms. Ogletree's and Mr. Greer's interests in the LLC. However, *Albright*, which involves a single-member LLC, does not stand for the proposition that the § 1325(a)(4) liquidation analysis allows a hypothetical chapter 7 trustee to force a liquidation of the LLC's assets notwithstanding the terms of the LLC's operating agreement. Nor does it hold that a hypothetical chapter 7 trustee in one case can reach out and control the estate of a second debtor in a separate chapter 13 case. In fact, *Albright* specifically notes that, under Colorado law, other members of an

LLC cannot be forced to permit a bankruptcy trustee to step into the shoes of a debtor to manage the LLC. *Id.* at 540.

Even assuming that the hypothetical chapter 7 trustee could force a liquidation of the LLC's property and equal distribution of the proceeds, Ms. Davis offered no comprehensible account of the funds that the general unsecured creditors would receive. Her arithmetic does not support her conclusion.

Therefore, the bankruptcy court did not err in overruling the Objection based on the Main Street Property and the liquidation analysis.

**C. The bankruptcy court did not err in its consideration of the Ene Road Property.**

Ms. Davis also argues that the court erred in excluding the Ene Road Property from its liquidation analysis. We do not agree with all of the bankruptcy court's reasoning on this point, but we agree with its result.

Ms. Davis contends that there was significant equity in the Ene Road Property to pay unsecured creditors. She claims that the sale of the property would result in net proceeds to the estate totaling $22,986.[4]

The bankruptcy court stated that, because Ms. Ogletree proposed to surrender the Ene Road Property under her plan, the proceeds of that property were not property of the estate and should not be included in the liquidation analysis. This was incorrect. The liquidation analysis compares

[4] Ms. Davis' calculations are again confusing and do not support her conclusion.

the results under a proposed plan with the results of a chapter 7 liquidation. In a chapter 7 case, the Ene Road Property would not be "surrendered," because that concept does not exist in chapter 7. It is inappropriate to project the results of the hypothetical chapter 7 liquidation using one term of a not-yet-confirmed chapter 13 plan.

But the bankruptcy court reached the correct result regardless. It properly rejected Ms. Davis' arguments about the liquidation analysis.

The starting point of the liquidation analysis is the probable selling price. In the bankruptcy court, Ms. Davis mentioned the 2004 purchase price of $299,000, a Zillow.com estimate of $262,822, and the tax assessed value of $250,000. She argued, rather arbitrarily, that the court should accept the highest of these numbers. However, she offered no evidence to support any of these figures. If she had attempted to do so, she would have had to overcome objections based on hearsay and unreliability.[5] She never explains why the court should have selected the highest (and most

---

[5] The Zillow "Zestimate" is particularly questionable. As Zillow itself says:

> The Zestimate is not an appraisal and can't be used in place of an appraisal. It is a computer-generated estimate of the value of a home today, given the available data.
>
> The Zestimate should not be used as the basis of any specific financial transaction because data sources may be incomplete or incorrect. The Zestimate is a starting point and does not consider all the market intricacies that can determine the actual price a home will sell for.

What is a Zestimate? Zillow's Zestimate Accuracy, https://www.zillow.com/zestimate/ (last visited Oct. 7, 2020).

outdated) number. The court did not clearly err in rejecting her valuation.

Ms. Davis also argues that there is no evidence that Ms. Taub made the payments and investments in the Ene Road Property as described in Ms. Ogletree's declaration. This is false; Ms. Ogletree's declaration was evidence on which the bankruptcy court properly relied.[6] Ms. Davis did not provide any evidence to contradict Ms. Ogletree's statements made under penalty of perjury, so it was not clear error for the court to accept Ms. Ogletree's valuation, including her sworn statements about Ms. Taub's contributions to the Ene Road Property.

Finally, she points out that Ms. Ogletree was a joint tenant with Ms. Taub and Mr. Greer. She contends that the proceeds of the property must be divided equally, without regard for the joint tenants' disparate contributions, unless the joint tenancy is severed or a partition action is filed. She is mistaken.

In Ms. Ogletree's hypothetical chapter 7 case, the trustee would succeed to Ms. Ogletree's joint tenancy interest in the Ene Road Property. Because fractional interests in property are hard to sell and usually sell at a significant discount, the hypothetical trustee would probably use § 363(h) to sell Ms. Ogletree's interest together with Mr. Greer's and Ms. Taub's

---

[6] Ms. Davis might mean that Ms. Ogletree's declaration was self-serving and uncorroborated, but self-serving and uncorroborated evidence is evidence nonetheless, and a court can rely on such evidence, particularly where there is no contrary evidence.

interests – in other words, to sell a 100% interest in the property.[7] The trustee would then distribute the net proceeds to the co-owners and the estate "according to the interests of such spouse or co-owners, and of the estate." § 363(j).

State law governs the various property interests implicated by § 363(h):

> As the Supreme Court has stated, "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979). In

---

[7] Section 363(h) provides:

> (h) Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if –
>
> > (1) partition in kind of such property among the estate and such co-owners is impracticable;
> >
> > (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
> >
> > (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
> >
> > (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

> fact, § 363(h) does not "purport to alter or redefine the property rights upon which it was designed to operate." *In re Persky*, 134 B.R. 81, 85 (Bankr. E.D.N.Y. 1991). Thus, under § 363(h), "[s]tate and not federal law determines the nature and extent of a debtor's interest in property as of the date of the commencement of his bankruptcy case under all of the authorities." *Lake Erie Leasing, Inc. v. Bundy (Matter of Bundy)*, 53 B.R. 582, 584 (Bankr. W.D. Pa. 1985); *see also In re Persky*, 134 B.R. at 85.

*UTSA Apartments, L.L.C. v. UTSA Apartments 8, L.L.C. (In re UTSA Apartments 8, L.L.C.)*, 886 F.3d 473, 487 (5th Cir. 2018); *see generally Stine v. Diamond (In re Flynn)*, 297 B.R. 599, 605 (9th Cir. BAP 2003), *rev'd and remanded on other grounds*, 418 F.3d 1005 (9th Cir. 2005) ("[T]he estate and co-owner each own that to which state property law entitles them. Thus, we construe § 363 in light of the property rights Stine and the trustee have under California law."). Similarly, state law determines the "interests" of the co-owners and the estate under § 363(j). *See In re UTSA Apartments 8, L.L.C.*, 886 F.3d at 487 ("[I]t naturally follows that state law should similarly determine the interest shares for purposes of a § 363(j) distribution following a sale pursuant to § 363(h).").

This is consistent with the general proposition that, "[u]nless the Bankruptcy Code or bankruptcy case law create other legal rights, the rights of parties to an interest in real property are established by applicable state law." *In re Rerisi*, 172 B.R. 525, 527 (Bankr. E.D.N.Y. 1994); *see In re Liggett*, 118 B.R. 213, 216-17 (Bankr. S.D.N.Y. 1990) (applying New York

state law to determine debtor's interest in real property).

It is also consistent with the fact that § 363(h) is a statutory partition provision. When determining the parties' respective property interests in partition actions, New York courts rely on equitable principles of division. *See, e.g.*, *Worthing v. Cossar*, 462 N.Y.S. 2d 920, 922 (1983) ("A partition action, although statutory, is equitable in nature and an accounting of the income and expenses of the property sought to be partitioned is a necessary incident thereof."). Under New York law,

> in determining the equitable division of property, the Court may consider the nature of the parties' relationship, disparities in down payments and mortgage payments, whether any such disparate contributions to the property were intended to be a gift, the reasonable value of improvements and repairs to the property and the reasonable value of rental payments with regard to an ousted co-tenant. In other words, while the Court should consider the parties' separate contributions to acquisition and improvement of the property, the Court also must consider the relationship between the parties and whether the co-tenant who paid for such expenditures intended his disparate contributions to be a gift.

*Melnick v. Press*, 809 F. Supp. 2d 43, 59 (E.D.N.Y. 2011) (citations and quotation marks omitted).

In the present case, the bankruptcy court properly accepted Ms. Ogletree's valuation of the property and her testimony about her mother's disproportionate contributions. It correctly held that, under New York law, the distribution of proceeds of any sale of the Ene Road Property

would have to take into consideration Ms. Taub's contributions including the down payment, closing costs, and renovation expenses. It thus did not err in rejecting Ms. Davis' liquidation analysis.

## CONCLUSION

The bankruptcy court did not err in overruling the Objection. We AFFIRM.

Sign in

# Zestimate

## (
## ZEST-ti-met
## )

The Zestimate® home valuation model is Zillow's estimate of a home's market value. The Zestimate incorporates public and user-submitted data, taking into account home facts, location and market conditions.

It is not an appraisal and it should be used as a starting point. We encourage buyers, sellers and homeowners to supplement the Zestimate with other research such as visiting the home, getting a professional appraisal of the home, or requesting a comparative market analysis (CMA) from a real estate agent.

Active Off Market

- Top Metro Areas
- States
- National

Data Coverage and
Zestimate Accuracy Table
Choose a location type below to change data:

- Top Metro AreasMedian Error
- States
- National

| METROPOLITAN AREA | MEDIAN ERROR | HOMES WITH ZESTIMATES | WITHIN 5% OF SALE PRICE | WITHIN 10% OF SALE PRICE | WITHIN 20% OF SALE PRICE |
|---|---|---|---|---|---|
| Atlanta, GA | 1.8% | 34.3K | 85.6% | 96.0% | 99.0% |
| Baltimore, MD | 1.5% | 16.1K | 88.1% | 96.7% | 98.8% |
| Boston, MA | 2.4% | 19.1K | 77.8% | 94.7% | 99.1% |
| Charlotte, NC | 1.7% | 13.1K | 87.4% | 96.7% | 99.0% |
| Chicago, IL | 2.0% | 59.0K | 85.1% | 96.2% | 99.1% |
| Cincinnati, OH | 2.0% | 11.4K | 84.5% | 95.7% | 99.1% |
| Cleveland, OH | 2.3% | 10.1K | 79.1% | 93.6% | 98.1% |
| Dallas-Fort Worth, TX | -- | 18.7K | -- | -- | -- |
| Denver, CO | 1.4% | 13.1K | 91.2% | 98.6% | 99.7% |

Last updated: June 26, 2019

Note: The Zestimate's accuracy is computed by comparing the final sale price to the Zestimate that was published on or just prior to the sale date.

Download an Excel spreadsheet of this data.

## Definitions

#### MEDIAN ERROR:

The nationwide median error rate for the Zestimate for on-market homes is 1.9%, while the Zestimate for off-market homes has a median error rate of 7.5%. This means that the Zestimates for half of all on-market homes are within 2% of the selling price, and half are not. For most major markets, the Zestimate for on-market homes is within 10% of the final sale price more than 95% of the time.

#### HOMES WITH ZESTIMATES:

We can only calculate Zestimates for homes and regions where we have certain data, including historical transactions. This column indicates the number of homes in an area that have Zestimates.

#### WITHIN 5% OF SALE PRICE:

This is the percentage of transactions for which the Zestimate was within 5% of the transaction price.

#### WITHIN 10% OF SALE PRICE:

This is the percentage of transactions for which the Zestimate was within 10% of the transaction price.

#### WITHIN 20% OF SALE PRICE:

This is the percentage of transactions for which the Zestimate was within 20% of the transaction price.

# Zestimate methods

Zillow publishes Zestimate home valuations for 97.5 million homes across the country, and uses millions of statistical and machine learning models that can examine hundreds of data points for each individual home.

To calculate a Zestimate, Zillow uses a sophisticated and proprietary algorithm that incorporates data from county and tax assessor records and direct feeds from hundreds of multiple listing services and brokerages. The Zestimate also incorporates a home's facts and features, which homeowners have the ability to update.

The Zestimate accounts for variables like:

- Home characteristics including square footage, location or the number of bathrooms
- Unique features like hardwood floors, granite countertops or a landscaped backyard
- On-market data such as listing price, description, comparable homes in the area and days on the market
- Off-market data — tax assessments, prior sales and other publicly available records

Currently, we have data for over 110 million U.S. homes and we calculate Zestimates for more than 97.5 million of them.

## How accurate is the Zestimate?

The Zestimate's accuracy depends on location and the availability of data in an area. Some areas have more detailed home information available — such as square footage and number of bedrooms or bathrooms — and other areas do not. The more data available, the more accurate the Zestimate value will be.

## Can the Zestimate be updated?

Yes. The Zestimate's accuracy depends on the amount of data we have for the home. Public records can be outdated or lag behind what homeowners and real estate agents know about a property, so it's best to update your home facts and fix any incorrect or incomplete information — this will help make your Zestimate as accurate as possible.

You can also add info about the architectural style, roof type, heat source, building amenities and more. Remember: We can't measure what we don't know. Providing as much information as possible about your home will yield the most accurate Zestimate.

In some parts of the country, we may have basic information on some homes — but not enough information about enough homes to compute a Zestimate.

## How can real estate professionals work with the Zestimate?

Millions of consumers visit Zillow every month. Most understand that the Zestimate is an estimate of the value of a home, and that it should be used as a starting point. When combined with the guidance of real estate professionals, the Zestimate can help consumers make more informed financial decisions about their homes.

We recommend that real estate agents and other professionals gain a basic understanding of how the Zestimate is calculated and how to read the Zestimate data accuracy table. This will help them explain to their clients why the Zestimate is a good starting point and historical reference, but should not be used for the final pricing of a home.

Real estate professionals can also help their clients claim their home on Zillow, update the home facts and account for any work they have done on the property. A home's Zillow listing is often the first impression for prospective buyers, and accurate information helps attract interest.

## FAQ

### My Zestimate seems too low or too high. What gives?

### I just listed my home for sale. Why did my Zestimate change?

### I just changed my home facts. When will my Zestimate update?

### How are changes to my home facts (like an additional bedroom or bathroom) valued?

### Is the Zestimate an appraisal?

No. The Zestimate is not an appraisal and can't be used in place of an appraisal. It is a computer-generated estimate of the value of a home today, given the available data.

The Zestimate should not be used as the basis of any specific financial transaction because data sources may be incomplete or incorrect. The Zestimate is a starting point

What is a Zestimate? Zillow's Zestimate Accuracy | Zillow Page 6 of 7 (24 of 25)

> and does not consider all the market intricacies that can determine the actual price a home will sell for.

## Why do I see home values for the past?

## Do you ever change historical Zestimates?

## Does the Zestimate algorithm ever change?

## How often are Zestimates for homes updated?

## Are foreclosure sales included in the Zestimate algorithm?

## Who calculates the Zestimate? Can someone tamper with my home's Zestimate?

## Does Zillow delete Zestimates? Can I have my Zestimate reviewed if I believe there are errors?

## I don't know of any homes that have sold recently in my area. How are you calculating my Zestimate?

## I'm trying to sell my home and I think my Zestimate should be higher.

## Can I use the Zestimate to get a loan?

## I have two Zestimates for my home. How do I fix this?

## What's the Estimated Sale Range?

REAL ESTATE

Browse all homes

Albuquerque real estate

Atlanta real estate

RENTALS

Rental Buildings

Atlanta apartments for rent

Austin apartments for rent

MORTGAGE RATES

Current mortgage rates

Alaska mortgage rates

BROWSE HOMES

California

Texas

Florida

New York

https://www.zillow.com/zestimate/ 11/4/2020

Austin real estate

Baltimore real estate

More

Baltimore apartments for rent

Boston apartments for rent

More

Alabama mortgage rates

Arkansas mortgage rates

Arizona mortgage rates

More

Ontario

More

About Zestimates Research Careers Help Advertise Fair Housing Guide Terms of use

Privacy Portal Cookie Preference Blog AI Mobile Apps Trulia StreetEasy HotPads

Out East

Do Not Sell My Personal Information →

Zillow Group is committed to ensuring digital accessibility for individuals with disabilities. We are continuously working to improve the accessibility of our web experience for everyone, and we welcome feedback and accommodation requests. If you wish to report an issue or seek an accommodation, please contact us.

Zillow, Inc. has a real estate brokerage license in multiple states. A list of our real estate licenses is available here.
TREC: Information about brokerage services, Consumer protection notice
California DRE #1522444

*Follow us:*

*© 2006-2020 Zillow* 

